```
 1                IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF NEW MEXICO

 3
     UNITED STATES OF AMERICA,      )
 4                                  )
                     Plaintiff,     )
 5                                  )
                   vs.              )   NO: 23-CR-915 MIS
 6                                  )
     JESUS CORONADO,                )
 7                                  )
                     Defendant.     )
 8

 9

10              PARTIAL TRANSCRIPT OF PROCEEDINGS
                          JURY TRIAL
11                     VOLUME II OF II
           (Trial testimony of Tiffany Smith and Candi Alvarado)
12         BEFORE THE HONORABLE MARGARET I. STRICKLAND
                  UNITED STATES DISTRICT JUDGE
13              TUESDAY, FEBRUARY 13, 2024
           LAS CRUCES, DOÑA ANA COUNTY, NEW MEXICO

14

15

16

17

18

19

20

21       (Proceedings recorded by machine shorthand and
     transcript produced by Computer-Aided Transcription.)
22
     REPORTED BY:     VANESSA I. ALYCE CHAVEZ, CRR, RPR, NMCCR
23                    Federal Official Court Reporter
                      100 N. Church Street
24                    Las Cruces, NM  88001
                      Phone:  (575) 528-1430
25                    Email:  Vanessa_Alyce@nmd.uscourts.gov
```

```
 1    Appearances of Counsel:

 2
          FOR THE UNITED STATES:
 3
                    UNITED STATES ATTORNEY'S OFFICE
 4                  District of New Mexico
                    100 N. Church St.
 5                  Las Cruces, NM  88001
                    BY:  RICHARD WILLIAMS, ESQ.
 6                       CHRISTOPHER MCNAIR, ESQ.

 7        FOR THE DEFENDANT, PRO SE:

 8                    c/o DONA ANA DETENTION CENTER
                    1850 Copper Loop
 9                  Las Cruces, NM  88005
                    BY:  JESUS CORONADO, PRO SE
10
          STANDBY COUNSEL FOR THE DEFENDANT, PRO SE:
11
                    LAW OFFICES OF RUSSELL DEAN CLARK
12                  755 S. Telshor, Bldg. R, Ste. 202
                    Las Cruces, NM  88011
13                  BY:  RUSSELL DEAN CLARK, ESQ.

14

15
      Also Present:  Emmalee Attencio, Staff U.S. Attorney's
16                    Office

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
100 N. Church Street, Las Cruces, NM  88001
(575) 528-1430

1                        I N D E X

2   WITNESSES FOR THE GOVERNMENT:                    PAGE

3   TIFFANY SMITH

4        Direct Examination by Mr. McNair              4
         Cross-Examination by Mr. Coronado            23
5        Redirect Examination by Mr. McNair           37

6   CANDI ALVARADO

7        Direct Examination by Mr. McNair             40
         Cross-Examination by Mr. Coronado            47
8        Redirect Examination by Mr. McNair           51

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          * * * * * * * *

2                    (Begin partial transcript.)

3            MR. MCNAIR:  Thank you, Your Honor.  The

4    Government calls Tiffany Smith.

5            MR. MCNAIR:  While we're waiting for her to come

6    in, do we know if it's possible for the --

7            THE COURT:  You can ask Mr. Jones.  He's back

8    there in the room, fixing it.

9                    (Discussion off the record.)

10           THE COURT:  Come forward to be sworn.

11                      **TIFFANY SMITH**,

12           After having been first duly sworn, did make the

13    following answers:

14                    **DIRECT EXAMINATION**

15    Q.  (BY MR. MCNAIR):  Good morning.  Could you

16    please state your name.

17    A.   Yes.  My name is Tiffany Smith.

18    Q.   And where do you work?

19    A.   I work at the FBI laboratory in the DNA Casework Unit

20    in Quantico, Virginia.

21    Q.   And how long have you been with the FBI?

22    A.   Since August of 2010.

23    Q.   And what is your current title?

24    A.   I'm a forensic examiner and also the case flow program

25    manager.

1    Q.    And so what are your responsibilities?

2    A.    As a forensic examiner, when we receive evidence into

3    the DNA Casework Unit, I will review the incoming

4    communication that outlines what is being submitted.  And I

5    will then direct a team of biologists to perform testing on

6    that evidence.  It depends on the type of case, but I might

7    do blood or semen testing, or I will go straight to DNA

8    testing.

9          Once my team of biologists process the evidence,

10   I will review all the data.  I will interpret the DNA

11   profiles obtained from the evidence.  I will compare those

12   profiles to known individuals, if any known profiles exist.

13   I will write a report and then testify, if needed.

14   Q.    And what is your educational background?

15   A.    I have a bachelor's of science degree from West

16   Virginia University in forensic investigative sciences, and

17   I have a master of science degree in biology, also from West

18   Virginia University.

19   Q.    And did you also teach during your post-graduate

20   career?

21   A.    I did.  So when I was in my master's program, I was a

22   teaching assistant, so I did research as well as taught a

23   variety of courses, including forensic DNA, cell DNA, things

24   of that nature.

25   Q.    And so when you mentioned your work history, you're at

1   the FBI.  Did you receive additional training, while working

2   at the FBI, in DNA testing and analysis?

3   A.   Yes.  So once I was hired by the FBI laboratory, I was

4   actually hired directly out of my master's program, so it

5   was my first job after college.  Once I was hired, I went

6   through a year-and-a-half training program before I could

7   work independently on case work.  In that year-and-a-half

8   training program, I did the same duties I currently do, but

9   it was under the direct observation or supervision from

10   qualified analysts.

11        I also worked in the laboratory on mock items of

12   evidence so that I could understand our standard operating

13   procedures, or SOPs, which are the procedures our biologists

14   follow when performing testing on items of evidence.  I also

15   went through a series of oral board exercises and moot court

16   examinations.  I took a test at the end of that training to

17   show that I was deemed qualified.  And then, at that point,

18   I was allowed to work independently.  After becoming

19   qualified, I still go through yearly continuing education to

20   maintain those qualifications.

21   Q.   And I guess, over the course of your career -- and

22   maybe you just mentioned that -- you have continuing

23   education in this field?

24   A.   I do.  So, every year, I'm required to take continuing

25   education hours.  Usually, that's in the form of reading

1    articles, attending conferences or presentations.  It could

2    be going to classes.  It really depends, but most of the

3    time, it's attending conferences.

4    Q.    Have you been a presenter at conferences?

5    A.    I've taught to our evidence response team.  That was

6    more like a few years ago.  I don't do it as much anymore;

7    however, I also taught DNA procedures to forensic nurses,

8    mostly on proper collection and preservation of evidence.

9    Q.    And do you have any publications in this area?

10   A.    I do not, no.

11   Q.    And have you received recognition by the FBI for your

12   work?

13   A.    I have.  I've received some awards for my continuing

14   work, as well as time-off awards, things of that nature.

15   Q.    Finally, have you been qualified as an expert related

16   to DNA testing in federal court before?

17   A.    I have, yes.

18            MR. MCNAIR:  At this time, Your Honor, the

19   Government would ask that Ms. Smith be recognized as an

20   expert in the field of DNA testing and analysis.

21            THE COURT:  What's -- Mr. Coronado, what's your

22   position?

23            THE DEFENDANT:  No objection, Your Honor.

24            THE COURT:  All right.  She's recognized as an

25   expert in the field of DNA testing and analysis.

1    Q.  (BY MR. MCNAIR):  So just to start, could you

2    explain for the jury what DNA is?

3    A.   Sure.  "DNA" stands for deoxyribonucleic acid.  And it

4    is our hereditary materials.  It controls all chemical

5    processes going on in our bodies but also controls what we

6    look like.  We receive half of our DNA from our mother and

7    half from our father.

8    Q.   And where is DNA found in our bodies?

9    A.   DNA is found within our cells.  If you picture a cell

10   similar to like an egg, the type of DNA I test would be

11   found in the yoke of that egg.  And the cells are the

12   building blocks of our body.  We have trillions and

13   trillions of cells.  And that means that we're going to have

14   DNA in our skin from our skin cells, in our blood from

15   certain blood cells.  Males have sperm cells that contain

16   DNA.  And then also all the different muscles and tissues

17   will also have DNA within them.

18   Q.   Does our DNA stay the same regardless of where it's

19   located in our body?

20   A.   It does, yes.  DNA is the same throughout your body.

21   Q.   And does it ever change over time?

22   A.   No, it does not.

23   Q.   And so what are some of the common sources of DNA for

24   testing and analysis?

25   A.   For forensic DNA testing, typically, we're going to

1    focus on body fluids, such as blood, semen, or saliva.  Body

2    fluids contain a lot of DNA, because there's a lot of cells

3    within those fluids.  We also look for what we call "touch

4    DNA."  And that's from, typically, skin cells or DNA that's

5    deposited on our hands.  When we touch items, we might leave

6    some of that DNA behind.

7    Q.    And does DNA vary from person to person?

8    A.    It does.  DNA is unique with the exception of

9    identical twins.  Identical twins do share the exact same

10   DNA profile.  Over 99 percent of our DNA is the same, and

11   that's what makes us humans.  It gives us two arms, a nose,

12   a mouth, but there's less than 1 percent of the DNA that

13   varies among individuals.  And we focus on a very small

14   portion of that 1 percent for forensic DNA testing, so that

15   we can see the differences among individuals.

16   Q.    And I guess if you could just briefly describe, like,

17   how you actually go about finding those differences.  What

18   are you looking at?

19   A.    Sure.  So in the type of testing that we do at the FBI

20   laboratory, we look at what is called "short tandem

21   repeats," or "STRs."  These are short regions of the DNA

22   that vary in their length.  So very similar to how trains

23   would work where all trains have an engine and a caboose,

24   some trains are really long because they have a lot of

25   boxcars; other trains are really small because they only

1    have a few boxcars.  It's the same with these STR regions.

2    Everyone has them; however, some individuals have more

3    repeats than others, making their DNA longer than somebody

4    else.  So, for instance, one person might get 7 repeats from

5    their mom, 12 from their dad, making their DNA profile a

6    7-12, where someone else might be a 15-20.

7    Q.   And so, when you're comparing DNA, could you explain

8    to the jury what a "known sample" is versus an "unknown

9    sample"?

10   A.   Sure.  Sure.  A "known sample" is a sample taken

11   directly from an individual so that we know the source of

12   that DNA belongs to that person.  Typically, this will be a

13   cheek swab or a blood sample.  We know that the DNA profile

14   generated is that individual's DNA profile.

15          An "unknown" or "evidentiary sample" is when we

16   don't know the source of the DNA.  So, for instance, if I

17   was to swab this microphone, I don't know whose DNA was

18   previously left on this item.  That's an unknown source;

19   however, I can compare that DNA to known individuals to see

20   if they are included or excluded as possible contributors.

21   Q.   And so you mentioned a "cheek swab."  Is that also

22   known as a "buccal swab"?

23   A.   Yes, it is.

24   Q.   And is that a common way of obtaining a known sample?

25   A.   Yes, that is the most common way because it's not very

1    invasive; whereas, taking blood from an individual is more

2    invasive.  So the common source we receive is a cheek swab.

3    Q.   What does the term "contributor" mean in relation to

4    DNA testing?

5    A.   "Contributor" is just a term we use to describe if an

6    individual's DNA might be present.  So we would say that

7    that person may be a contributor to the DNA; their DNA might

8    have been left behind on that item.  It could also mean, if

9    DNA is from more than one individual, we could say that

10   multiple contributors are present on an item.

11   Q.   And so when you're examining DNA from a particular

12   item of evidence, is it common that you find that there are

13   multiple contributors?

14   A.   It is very common.  Especially, if it's a common-use

15   item.  Again, this microphone has probably been touched or

16   handled by multiple people, so if I were to swab this

17   microphone, I would expect to find a mixture of DNA, which,

18   again, means that DNA from more than one individual or more

19   than one contractor might be present.

20   Q.   And, I guess, when you're doing your DNA testing and

21   analysis, how do you tell those apart?  How do you

22   differentiate between those?

23   A.   So to determine the number of contributors, I will

24   look at the profile in its entirety.  Again, because we

25   receive one DNA type from our mom and one DNA type from our

1    dad, we expect a maximum of two numbers or two peaks for a

2    single individual.  So, for instance, you could get the same

3    DNA type from both parents, so you could get a 7 and a 7,

4    meaning you'd only have one DNA type.  Or, again, you could

5    get one from mom, a 7, one from dad, a 12, making your DNA

6    type a 7-12.  You would expect two types.  If I see more

7    than two peaks, that means the DNA, most likely, was left

8    behind by more than one individual.  So I look at the

9    profile in its entirety to determine the number of

10   contributors.

11           Once I determine the number of contributors, I

12   have software tools that will help break apart those

13   contributors to allow for comparisons and statistical

14   analysis.

15   Q.   And, I guess, as part of that statistical analysis,

16   are you actually able to quantify how prevalent a

17   contributor's DNA is in relation to the other contributors?

18   A.   I do that by individually looking at the DNA profile

19   as well.  So when I look at a DNA profile, I can see whether

20   all of the contributors left behind similar amounts of DNA

21   or I can tell if one person left behind the majority of the

22   DNA.

23           Once I do that, I can also use the software

24   packages that will estimate the percentage of each

25   contributor.  So I can look at the sample and be able to

1   kind of get an estimate of what I think I should see by

2   using this additional statistical tool.

3   Q.   And are you able to distinguish between male and

4   female contributors?

5   A.   I can.  So when we do our DNA analysis, we look at 21

6   of those STR locations and then we also look at three

7   sex-determining locations.  Those sex-determining locations

8   will tell me if a male DNA is present, if a female is

9   present, or potentially a mixture of both.

10   Q.   And you mentioned identical twins earlier sharing the

11   same DNA profile.  What about just siblings, in general?

12          (Reporter interruption for clarification.)

13   A.   In general, siblings share approximately 50 percent of

14   their DNA.  They can share more or less, but, on average,

15   it's around 50 percent.

16   Q.   And so if you were looking at, say, male and female

17   siblings, comparing their DNA, how would that affect your

18   comparison or your analysis?

19   A.   So the STR locations that we look at, we would expect,

20   between full siblings, meaning they have the same mom and

21   same father -- we would expect approximately 50 percent of

22   their DNA would be similar; however, that sex-determining

23   location would be different.  So a male would, again, show

24   up as a male in a sample; whereas, a female would show up as

25   a female.  So I would be able to distinguish between male

14

1    and female siblings.

2    Q.   Are you familiar with the term "degradation" in

3    relation to DNA?

4    A.   Yes.  "Degradation" is when DNA breaks down.  And this

5    can occur due to a variety of factors.  Time, for instance.

6    So if the sample is very old, it will begin to break down

7    over time.  If an item of evidence is left out in different

8    environmental conditions, it will also begin to break down.

9    So, for instance, UV light or sunlight can begin to break

10   down the DNA.  Bacteria, mold will begin to break down the

11   DNA.  Water, humidity, those all also have effects on the

12   DNA profile.

13            One thing to note, though, is, when the DNA

14   degrades, it does not change, it just is no longer able to

15   be detected.  So, for instance, if you were to put ground

16   hamburger out on your deck in a hot summer day, it will

17   begin to rot, but it won't turn into chicken.

18   Q.   So I guess, ultimately, the DNA is still there, in a

19   sense, but you're not able to obtain a usable sample; is

20   that correct?

21   A.   Yes, that's correct.  The DNA begins to break down

22   into too small of components for us to be able to connect it

23   any longer.

24   Q.   Could you provide a general overview of how DNA

25   testing is conducted at the FBI laboratory?

1    A.    Sure.  At the FBI laboratory, what I will do first is

2    I will set up what we call an "exam plan" first.  And that

3    is a listing of what I want tested in a particular case.  My

4    team of biologists will begin the testing.

5         The first process is a "collection."  And that is

6    when a biologist will swab or cut an item of evidence to try

7    to obtain those cells that contain DNA.  They will put that

8    swab or cutting in a tube that's uniquely labeled and

9    bar-coded to distinguish it from all other samples.

10        Then the biologist will add chemicals and heat.

11   This will break open those cells containing the DNA to

12   release the DNA from that yoke, for instance, when you're

13   picturing the egg.  Once that DNA is removed, it goes

14   through a series of washing steps to remove everything else.

15   It removes the proteins.  It removes the lipids.  It removes

16   all the other cellular components just leaving clean

17   purified DNA.

18        We then quantify how much DNA is present.  This

19   is extremely important because we want to make sure we put

20   enough DNA in the next step to detect it, but we don't want

21   to put too much DNA in, because we might overblow the

22   sample.

23        The fourth step is the amplification process.

24   And this is where we make millions of copies of those STR

25   regions, so we're just focusing on those portions of DNA

1    that vary among individuals, ignoring everything else that

2    is the same.  So similar to a photocopier at work, you can

3    make copies of a single page in the book instead of the

4    entire book.

5              Lastly, we'll run it through a separation process

6    where the small fragments of DNA with the -- the DNA

7    fragments that have the fewer number of repeats will travel

8    quickly through the machine.  The longer pieces of DNA move

9    more slowly through the machine.  And this will generate,

10   eventually, a DNA profile that I can then analyze and

11   interpret and then, eventually, compare to known

12   individuals.

13   Q.   Okay.  So on that last point, so once you have the DNA

14   profiles, that's when you do your comparison?

15   A.   Yes.  The first thing I will do is actually interpret

16   the evidence before even looking at a known sample.  So I

17   will look at the evidence profile to determine if it was

18   male, female, or a mixture of both.  I will then determine

19   if the DNA was left behind by one contributor or more than

20   one contributor.  This would indicate a mixture.  And once

21   that is done, I will then, at that point, compare a known

22   individual to that evidence to see if their DNA matches the

23   evidence, which means the DNA is the same between the known

24   individual and the evidence item; or I will determine if the

25   DNA is different.  That is an exclusion; meaning, the DNA

1    between a known individual is not the same as an evidence of

2    item -- or excuse me, an item of evidence.

3    Q.   And so, I guess, how do you express your ultimate

4    conclusions in regard to whether or not there's a match?

5    A.   So if a match is present, I have to provide a

6    statistic to show the strength of that match.  I can't just

7    simply state that an individual matches, because multiple

8    people might match that sample, depending on the quality of

9    the profile.

10         So in order to do this, I calculate a statistic

11   called a "likelihood ratio."  A "likelihood ratio" is really

12   just a mathematical formula that compares the probability of

13   observing that DNA, giving two alternative explanations.

14   The first is:  What is the probability of observing that DNA

15   profile, given that it originated from a particular person

16   of interest?  And I compare that to the probability of

17   observing the DNA profile, given that it was generated by a

18   random unrelated individual and not that person of interest.

19         This statistic will provide a number.  That

20   number can be one, and that means it's equally likely that a

21   contributor -- or that a certain person is a contributor or

22   not a contributor.  So it's very uninformative.  It doesn't

23   provide any helpful information.  The number can be less

24   than one.  That actually supports exclusion; meaning that

25   person -- it's more likely that it was left by someone other

1    than your contributor.  And then, lastly, you can get a

2    number greater than one.  If you get a number greater than

3    one, that means there is more support that that individual

4    is a contributor.  That number can range from two to,

5    really, infinity.  So the bigger the number, the more

6    support.

7              So, for instance, if I was to say something is

8    two times more likely to occur, there's strength for that,

9    but two times more likely is not -- it's very limited in

10   strength.  However, if I say something is a million times

11   more likely to occur, that is going to provide very strong

12   support for that chance, you know, that explanation.  So,

13   again, the number is really what's important.  The bigger

14   the number, the more strength of a particular explanation of

15   the DNA.

16   Q.   And so, once you've done all that, how do you know, in

17   the process when you're doing your analysis, whether or not

18   the testing that you performed was reliable?

19   A.   So, at the FBI laboratory, we follow very strict

20   standard operating procedures.  So if we follow those

21   procedures, we know we're going to get similar results every

22   time we do the test.  In addition, our biologists and

23   examiners are extensively trained.  We also go through very

24   strict cleaning procedures in the laboratory.  So the

25   biologists will only take one item of evidence out at a

19

1    time.  They will then close that item up, put that item

2    away, and then clean the entire work surfaces with bleach to

3    remove any residual DNA that might be present.

4              The laboratory, as a whole, is accredited;

5    meaning, that an outside organization comes into the lab to

6    review our procedures, our staff, our training, and deems

7    that we are meeting all the standards that are required.

8    And, lastly, the FBI laboratory also, especially the DNA

9    Casework Unit, is audited every other year by an external

10   body to ensure we're following quality assurance standards

11   for DNA testing laboratories.

12   Q.   And, I guess, a little bit on that point, what is

13   "cross-contamination"?

14   A.   "Cross-contamination" is when DNA from one item of

15   evidence gets contaminated or transferred to another item of

16   evidence, even though they've never been in direct contact

17   with one another.

18   Q.   And so how do you protect against that in your

19   procedures and protocols?

20   A.   So, again, a biologist will only take one item of

21   evidence out at a time.  They will then put that item away,

22   use bleach to clean all of their work surfaces.  Bleach is

23   known to break down or remove DNA from an item of evidence.

24   After -- or excuse me, from a surface.  The biologists also

25   wear personal protective equipment, including gloves, masks,

1    eye protection, lab coats to prevent their DNA from ending

2    up on an item of evidence.  And then, also, we have controls

3    that are run with every step in the process.  And a control

4    is going to show us if contamination potentially occurred or

5    if the procedure worked properly.

6          So, for instance, during the extraction process

7    where we're breaking open those cells, we have a control

8    that is run alongside the evidence that has no DNA in it, so

9    that if any DNA is detected in that sample, we know that

10   contamination occurred and we would not report those results

11   or we would have to at least seek guidance from our

12   technical leader, but we would report the contamination.

13   Q.   So I want to return to the facts in this case.  In May

14   of 2022, did the FBI laboratory receive a firearm that was

15   recovered from 1425 Durazno?

16   A.   Yes, we did.

17   Q.   And did you also receive a buccal swab from

18   Mr. Coronado?

19   A.   Yes, we did.

20   Q.   And I guess -- so that went through the five-step

21   process, the collections, the amplification -- I can't

22   remember all the things you said, but it went through

23   that -- the testing of that went through that five-step

24   process?

25   A.   Yes, the buccal sample and the firearm went through

1    that five-step process.  For the buccal sample, a cutting

2    would have been taken.  And for the firearm, all of the

3    textured surfaces would have been swabbed to try to collect

4    any potential cells that might be trapped within that

5    textured area.

6    Q.   And so did you ultimately conclude whether or not

7    Mr. Coronado's DNA was a match to the known sample from the

8    buccal swab?

9    A.   Yes.  So once the entire DNA process was complete, I

10   interpreted the DNA profile from the firearm first.  So on

11   that firearm, male DNA was observed to be present on the

12   firearm.  Also a mixture of DNA was observed.  That mixture

13   was interpreted, assuming that the DNA originated from three

14   contributors.  Once I determined it was a male profile with

15   three individuals, I compared that to Mr. Coronado.  And I

16   determined that he could not be excluded; meaning, he was a

17   match to the DNA present on that firearm.

18           So because I had a match, I had to calculate a

19   statistic to, again, show the strength of that match.  And

20   in this particular case, that likelihood ratio I generated

21   was 3.8 septillion.  What that means is the DNA results from

22   the firearm are a septillion times more likely to occur if

23   Mr. Coronado and two unrelated, unknown individuals are

24   contributors than if three unknown, unrelated individuals

25   are contributors.  This provides very strong support for

1    inclusion of Mr. Coronado being a contributor to that

2    firearm.

3    Q.   Would that be -- I guess, on the hierarchy of that,

4    would that be at the highest level of strong support -- of

5    support for inclusion?

6    A.   At the FBI laboratory, we have kind of a verbal scale

7    to apply the strength of the support.  And the highest level

8    is anything over a million is considered very strong

9    support.  And because 3.8 septillion is over that number, it

10   does fall in our highest category, yes.

11   Q.   And at any point in the testing process, were there

12   alerts?  You were talking about the control samples and

13   things like that.  Were there any alerts for

14   cross-contamination?

15   A.   No, there were not.

16   Q.   And, let's see, so you mentioned that there were three

17   contributors to the firearm; is that correct?

18   A.   Yes, I interpreted the mixture of DNA from that

19   firearm as originating from three individuals.

20   Q.   And a little bit before, you were saying that you were

21   actually able to quantify the prevalence of the DNA profiles

22   in relation to the contributors; is that correct?

23   A.   Yes, I am.  I was able to look at the DNA obtained

24   from the firearm.  And what I observed is one individual was

25   donating the majority of the DNA, and the other two

1    individuals were donating low levels of DNA.  So when I look

2    at a DNA profile, it really looks like just peaks on a

3    graph.  So if you have a major contributor, their peaks are

4    going to be really tall, and the minor individuals are going

5    to be really small.  It's kind of like, if you were looking

6    at a cityscape, you have really tall skyscrapers and little,

7    small houses.  In this case, I was able to look at the

8    profile and observe that one person was donating the

9    majority of the DNA.

10   Q.   And who was that person?

11   A.   When I compared Mr. Coronado's DNA to the mixture as a

12   whole, he was consistent with that major contributor, which

13   accounted for approximately 76 percent of the DNA.  But,

14   again, I can't state it was him to the exclusion of all

15   others.  Alls I can state is that his DNA was consistent

16   with that major contributor.

17              MR. MCNAIR:  I'll pass the witness.

18              THE COURT:  Cross-exam?

19              THE DEFENDANT:  Can I have a couple seconds?

20              THE COURT:  You can.  Go ahead.

21              (Discussion off the record.)

22                        **CROSS-EXAMINATION**

23   Q.   (BY THE DEFENDANT):  Good morning.

24   A.   Good morning.

25   Q.   You were mentioning your -- your degrees and your

1    forensic history.  As far as the lab that you work at, the

2    laboratory that you work at, it's a federal bureau lab --

3    A.   Yes.

4    Q.   -- for the FBI?

5    A.   Yes, that's correct.

6    Q.   So you work for the Government?

7    A.   I do, yes.  I work for the FBI laboratory, which is a

8    Government agency, that's correct.

9    Q.   And has the lab that you work for ever made mistakes?

10   A.   Mistakes can occur.  That's why we have those standard

11   operating procedures that our biologists follow to prevent

12   any mistakes.  If a mistake does occur, it gets documented

13   in a case file when it's identified.

14              (Discussion off the record.)

15   Q.   And as far as, in the laboratory, the work that you

16   do, have you ever personally made mistakes?

17   A.   Oh, sure.  During my training when I was just learning

18   how to do things, I definitely --

19   Q.   Objection.  Just "yes" or "no."

20   A.   Yes, in my training, yes.

21   Q.   And you mentioned the testing that's done.  So you can

22   tell the different between -- so you didn't mention urine,

23   feces, hair, or -- basically urine, feces, and hair.  Does

24   that have DNA that can be tested?

25   A.   It can.  Urine typically does not have very much DNA

1    in it.  Unless a person has an infection, and then they

2    would have maybe some more white blood cells in their urine,

3    but urine, itself, is just going to be picking up DNA when

4    this travels throughout the body.  Like, so when it travels

5    out the urethra, it might pick up some skin cells.  But

6    because it's a liquid, it's very diluted so there's not a

7    lot of cells in urine.  Feces typically is not a good course

8    of DNA because of all the bacteria in the body will actually

9    digest or break down that DNA.  So feces, we do not

10   typically test for DNA at the FBI laboratory.  And then

11   lastly, hairs, hairs do have DNA if they have the root

12   material.  So if the hair is pulled out of your head, then

13   skin cells will be present on the root of the hair.  And we

14   can do the type of testing that I perform on that root.

15   Otherwise, it's a different type of testing, which is called

16   "mitochondrial DNA" for the shaft alone.

17           So, again, yes, DNA is found throughout all of

18   our cells in different bodies fluids, but at the FBI, we

19   typically are testing for blood, semen, saliva, or skin

20   cells.

21   Q.   And so, if you were to cough or sneeze, is that --

22   would that eject skin cells or DNA?

23   A.   Yes, it absolutely could.  If you cough or sneeze,

24   saliva could come out of your mouth during that act.  And

25   saliva does contain DNA, so, yes, that is possible.

1    Q.   And so any items or objects that a person happens to

2    wear as far as masks, gloves, hats, clothes, they would

3    contain DNA?

4    A.   They could, yes.  So again, if you're wearing an item,

5    you could be picking up skin cells or body fluids on those

6    items so, yes, that is possible.

7    Q.   And as far as the samples, do you have knowledge as to

8    how many people handled the buccal swabs before they came to

9    your -- to the laboratory?

10   A.   I do not know.  Once they were received by the

11   laboratory, they would be assigned an item number, but I

12   don't know the history of the buccal sample prior to it

13   arriving at the lab.

14   Q.   And once it is at the lab, how many people handled the

15   samples at the lab?

16   A.   I would have to refer to my notes.

17           THE WITNESS:  Your Honor, may I refer to my

18   notes?

19           THE COURT:  Do you want her to refer to her

20   notes?

21           THE DEFENDANT:  Yes.

22           THE COURT:  Go ahead.

23           THE WITNESS:  Sure.

24   A.   So are you talking -- may I ask, just for

25   clarification, the actual box that it's in or the sample

1    itself?

2    Q.   (BY THE DEFENDANT):   Both.

3    A.   Both.

4              I see approximately ten individuals handled the

5    box itself.   So when the item is mailed to the laboratory,

6    it will get inventoried or checked into the lab.   The item

7    is not opened or anything of that nature, it's just checked

8    in.   It then moves from location to location.

9    Q.   So just ten?   That would be fine, just ten people?

10   A.   Yes, ten people handled the box, and two individuals,

11   it appears, opened the item.

12   Q.   And do you have any knowledge how many people handled

13   the firearm before it came to the lab?

14   A.   Before it came to the lab, no, I would not.

15   Q.   And do you -- is that the same amount of people that

16   handled the firearm when it did come to the lab?

17   A.   It would be approximately the same because the items

18   tend to travel together, yes.

19   Q.   And so you mentioned procedures that you have to

20   follow to make sure that the samples stay authentic, that

21   there's no cross-contamination?

22   A.   Yes, that's correct.

23   Q.   And did all those procedures -- did you follow every

24   procedure to the T?

25   A.   Yes, my biologists would have followed the procedures.

1    If any of the procedures were not followed, it would have

2    been documented, and there was no documentation in the file.

3    Q.   So you're not the biologist that did the sample test?

4    A.   No.   I have a team of biologists.   I'm the forensic

5    examiner that was assigned to this case and directed a team

6    of biologists to perform that testing.

7    Q.   And so you're familiar with the sample well?

8    A.   I'm sorry.   Can you clarify?   I could not hear you.

9    Q.   The well plate that the samples go in?

10   A.   Yes, I am.   A "well plate" is just a plate where the

11   samples are -- or a portion of each sample is added to the

12   plate, and it goes through that quantification and

13   amplification process in a plate format.

14   Q.   And is it true, according to -- is it true that those

15   tests in that well plate were both conducted together, right

16   next to each other in the same -- right next to each other

17   on the well plate, at the same time, on the same date?

18   A.   Yes, for the amplification process, it was.   The

19   quantification process, they were not directly next to each

20   other.   During the amplification process, it is routine that

21   they are.   Again, the control is also right next to that

22   sample to show that any contamination would not have

23   occurred.   And, again, that procedure is extensively

24   validated to show that contamination from well to well would

25   not occur.

1    Q.   And so -- but can those samples be separated on the

2    well plate -- on the -- yeah, the well plate?

3    A.   They can, but that's not our common practice.

4    Typically, each case will be put onto the well plate as a

5    whole to fill up that well plate.

6    Q.   And so can you say, just so that the jury has an idea,

7    how many spaces are in a well plate?

8    A.   Ninety-six wells.

9    Q.   And the samples were put right next to each other on

10   the well plate out of 96 spaces?

11   A.   Yes.  And I just want to refer to my notes to just

12   make sure I can visualize it appropriately.

13        Yes, so the evidence item was put on in one well.

14   Then the buccal and then also the control were together.

15   Yes, that's correct.

16   Q.   Right next to each other?

17   A.   Yes.  And, again, that's standard routine practice.

18   Q.   And it wouldn't be better to separate and keep them as

19   far away so that there wouldn't be any cross-contamination?

20   "Yes" or "no"?

21   A.   It's not really applicable to a "yes" or "no" answer,

22   because, yes, you can do that; however, again, our process

23   has been validated that way and shows that contamination

24   does not occur.

25   Q.   So DNA -- all of us here today, we're transferring DNA

1  as we speak, or as you're talking right now, there's DNA

2  that's being transferred from your body to any of the items

3  there (indicating)?

4  A.   Sure, it's possible, yes.

5  Q.   And you said that there was three contributors on the

6  firearm?

7  A.   Yes, that is correct.

8  Q.   But there was no other testing done for anybody else

9  except for one contributor for the buccal swab?

10  A.   I only received one buccal sample in this case, so I

11  was not able to compare anybody else to the firearm, that is

12  correct.

13  Q.   And according to your procedures or -- is it fair to

14  say that you have access to a DNA database?

15  A.   We do have a DNA database.  It's called CODIS, or the

16  Combined DNA Index System.  And some eligible DNA profiles

17  are allowed to be searched in that database to determine

18  some investigative leads to determine who might have left

19  their DNA on that item.  We do have access to that database,

20  yes.

21  Q.   And so do you know how the database -- I mean, in some

22  places, you go to jail, they make you take a DNA before you

23  get released, or there's just different collections of DNA

24  from different agencies, or is it just all one agency?

25  A.   So CODIS is made up of arrestees, convicted offenders,

1    detainees, as well as family members.  If they're missing --

2    missing persons, then they can put their own DNA in the

3    database to search against unidentified human remains that

4    are located.  So there are DNA samples collected from a

5    variety of individuals that will go into specific categories

6    of the database.  And that is national, so it's -- all law

7    enforcement agencies contribute to that database, as long as

8    they follow the quality assurance standards.

9    Q.   And so would it be possible, if you only had the

10   firearm, without the buccal swabs, and you tested the

11   firearm, any DNA that came out, those -- that DNA could be

12   retrieved from that database?

13   A.   No, not in this case.  So firearms typically are not

14   searched in CODIS because it depends on what the potential

15   charge would be.  So if, for instance, the charge might be

16   felon in possession, that gun is not eligible for searching

17   in the DNA database.  If the gun is used in a particular

18   crime and then abandoned, it might be eligible for

19   searching.  In this particular case, I did not have all the

20   information about the CODIS eligibility.

21          In addition, based off of the DNA profile

22   obtained, I would expect that only the major contributor

23   would have been of sufficient quality to be searched in the

24   CODIS database.

25   Q.   And any other people that were involved in this case,

1   there was no other DNA tests or DNA tests retrieved from

2   that database pertaining to this case?

3   A.   I'm not allowed to go into the database and pull

4   people's DNA out.  There are no names in the database, and

5   so this is not actually legal to do that.  I have to -- the

6   only way to compare samples in the database is to actually

7   enter the evidence profile in the database.  And the profile

8   must be of sufficient quality and quantity.  So, again, only

9   the major contributor would have probably met that criteria.

10  In order to do comparisons, I would have had to have

11  received a known sample from additional individuals.  And in

12  this case, I did not receive additional knowns.

13  Q.   And as far as the cross-contamination, is that an

14  assumption?  You assume that the firearm didn't receive any

15  cross-contamination, or is that a fact?

16  A.   I can't say what happened to the firearm before it

17  came to the FBI laboratory.  What I can state is, once it

18  was at the FBI laboratory, it followed our standard

19  operating procedures, which limits or prevents any

20  contamination from occurring.  And, again, using the

21  controls in this case, no contamination was detected.

22  Q.   And so if the firearm was -- if the firearm is placed

23  on a piece of clothing, could DNA be transferred to that

24  firearm that you reviewed or tested?

25  A.   It is possible.  So I can't state how or when the DNA

1    was left behind on an item of evidence.  I can only state

2    whether DNA was detected on that item.  Transfer can occur

3    between items, but the transfer is going to depend on a

4    variety of things.

5            So, for instance, if the DNA on the clothing was

6    wet, so, like, for instance liquid blood, that's going to

7    transfer more readily than a dried blood stain or a dried

8    anything.  It doesn't have to be a blood stain, but any

9    dried sample is going to transfer less readily.  The type of

10   contact, like, friction contact is going to be more likely

11   to transfer DNA versus just laying an item on an object.

12   The length of time can have an effect.  So, yes, it is

13   possible, but there's a variety of factors that would go

14   into play.

15   Q.   So, for example, if somebody were to put a gun into a

16   glove that was worn by somebody, would that transfer DNA?

17   A.   It is possible.  Again, I can't state how or when the

18   DNA was left behind.

19   Q.   Now, there was -- did you do the testing on any

20   steering wheels or anything like that?

21   A.   Yes, I did.  So I received additional submissions of

22   evidence later on.  And I did obtain swabs of steering

23   wheels, that is correct.

24   Q.   And so most steering wheels are handled by hand,

25   right?  I mean, I don't really -- that's obvious?  Is that

1    pretty obvious?

2    A.    Yeah, that would be my assumption, yes.

3    Q.    And so firearms would probably, more than likely, be

4    handled the same way, with a hand?

5    A.    Yes, that is possible; however, oftentimes, firearms

6    are often put in waistbands.  Using a firearm or holing a

7    firearm, that would be hand contact, that's correct.

8    Q.    And so you were saying about -- so there's a different

9    between rich DNA or a rich sample and samples that are not

10   rich in DNA?  There's a big difference that can be tested

11   for?  The richness or the high -- how rich the sample -- how

12   much DNA is carried in that sample?

13   A.    One of the steps in the process -- we do quantify the

14   amount of DNA that is present.  So there is a step in our

15   process that kind of gives us an idea of how much DNA was

16   able to be obtained from our swabbing of the firearm, yes,

17   that's correct.  I believe I'm answering the question.

18   Q.    And the DNA samples on the steering wheels that you

19   conducted, were -- some were negative and some were low?

20           THE WITNESS:  Your Honor, again, may I refer to

21   my notes?

22           THE COURT:  Yeah.

23   A.    So we received two separate submissions that involved

24   a swab from a steering wheel.  One was two swabs from a

25   white Ford F-150 steering wheel, and also a swab from a

1    steering wheel from a 2007 GMC Denali.  I was able to obtain

2    comparable DNA from both of those swabs of the steering

3    wheel.  One was more -- you know, had more DNA than the

4    other; however, one was of limited quantity.

5    Q.   So is that a big difference compared to the -- what

6    was found on the firearm?  As far as the quantity.

7    A.   So on one of the swabs from the steering wheel, very

8    little DNA was found, so there was less DNA found as

9    compared to the firearm.  On the other swabs from the

10   steering wheel from the Ford F-150, there was actually

11   slightly more DNA on that swab of the steering wheel than

12   the firearm.  So the firearm fell in the middle between the

13   two when we estimated the quantity of the DNA obtained.

14   Q.   Did any of the -- there was DNA, but did any of the

15   DNA come back to anybody that you tested for?  Any matches?

16   A.   Yes.  So -- from the steering wheel swabs?

17   Q.   Yes.

18   A.   Yes, so when I -- again, I compared the steering

19   wheel -- there was two sets of steering wheels, so they were

20   each tested independently.  For the two swabs from the white

21   Ford F-150 steering wheel, male DNA was obtained.  And,

22   again, it was interpreted originating from three

23   individuals.  When I compared the DNA to the known sample I

24   had for Mr. Coronado, I could not exclude him as a possible

25   contributor to that DNA.  For this sample, the likelihood

36

1    ratio was 1.9 billion, which was very strong support for

2    inclusion.

3           And then, for the second swab from the steering

4    wheel, which was the 2007 GMC Denali, this was the sample

5    that had very little DNA obtained from it.  So for that swab

6    from the steering wheel, no conclusion could be made

7    regarding the sex-typing results; meaning, I couldn't tell

8    whether it was male or female.  And it was interpreted,

9    assuming the DNA originated from two individuals.  When

10   compared to Mr. Coronado, again, I could not exclude him as

11   a possible contributor; however, the likelihood ratio in

12   this instance was 63, which is limited support for

13   inclusion.

14          MR. MCNAIR:  And, Your Honor, could I just object

15   in the sense of relevance on the Denali.  It's something

16   we've talked about before.

17          THE COURT:  Okay.  Well, she just testified to

18   it, so...

19          MR. MCNAIR:  I know, but just any further

20   questions on that.

21          THE COURT:  All right.  Sustained as to the

22   Denali.

23          Go ahead, Mr. Coronado.

24   Q.  (BY THE DEFENDANT):  So there was a rich source

25   of DNA on the firearm?

1    A.   Yes, there was enough DNA to perform a comparison and

2    calculate a statistic, so there was significant amounts of

3    DNA present.

4    Q.   And is that common with handling with your hands?

5    A.   Yes, it is possible, because you can leave skin cells

6    behind.  You might also leave other body fluids behind.  So,

7    for instance, if you sneeze or cough and cover your mouth,

8    you could have saliva also on your hand.  So when you touch

9    something, it's not necessarily just DNA from skin, it could

10   be DNA from other body fluids as well.

11              THE DEFENDANT:  That will be all, Your Honor.

12              THE COURT:  Redirect?

13              MR. MCNAIR:  Just briefly, Your Honor.

14                   **REDIRECT EXAMINATION**

15   Q.   (BY MR. MCNAIR):  So you were interrupted

16   whenever Mr. Coronado was asking you about how many

17   people had handled the buccal swabs.  Did you --

18   would want to finish your answer on that?

19   A.   Yes, sir.  For the buccal swabs, it is routine that,

20   when evidence is mailed to the laboratory, again, it will

21   get inventoried by an individual.  And all they're doing is

22   receiving -- or excuse me, not inventorying, they're

23   receiving the box.  So they receive the box from the FedEx

24   truck driver.  They're just talking the box.  They're not

25   opening it.  They then will put it in the evidence vault.

1    It will then get inventoried by an individual, which will

2    typically open the packaging to verify they received the

3    correct item.  That individual will then package it up.  And

4    someone else might move the box to the DNA Unit.  So for

5    instance, it will get transferred to the DNA Unit, but,

6    again, it would not be opened.  It will stay in a properly

7    sealed condition.

8            Once it is received by the DNA Unit, somebody

9    might inventory that or take the sample, but they're not

10   opening the buccal again, they're just receiving the package

11   to verify that it was received.  The first person that

12   really opens it and processes it in the DNA Casework Unit

13   would be the individual doing the collection.  That's the

14   person that's cutting or swabbing the item of evidence.

15   Once they've opened the box, they -- or excuse me, the item

16   and they finish their collection, they'd reseal it and move

17   it to an evidence vault.

18           So, again, the box will travel from person to

19   person, but, really, it's not being opened or handled by

20   anyone other than the person doing the inventory and the

21   person doing the collection.  And also, in this case, the

22   buccal DNA profile showed a single individual, so that is

23   consistent with just one male person.  There was no

24   instances of a mixture on the buccal, which would be

25   indicative of a contamination.

1    Q.    And you were also asked whether or not Mr. Coronado's

2    DNA was on a steering wheel swab from the white F-150?

3    A.    I did compare Mr. Coronado to the DNA obtained from

4    that Ford F-150.  And, again, he matched or could not be

5    excluded a possible contributor.  So, again, whenever you

6    have a match, you can calculate a statistic.  And this was

7    1.9 billion for the likelihood ratio.

8    Q.    And are you aware -- I don't know if your notes say.

9    Were those swabs of the steering wheel, were those swabs

10   obtained by the Las Cruces Police Department?  You didn't

11   have the physical steering wheel at the laboratory, correct?

12   A.    That is correct.  We received swabs from the field.

13   We did not actually receive the steering wheel from the

14   field.  That is correct.

15   Q.    I guess do your notes -- maybe they don't say, but do

16   you know who took those swabs?

17   A.    I would not know who took those swabs, no.

18              MR. MCNAIR:  Okay.  No further questions, Your

19   Honor.

20              THE COURT:  Thank you, ma'am.  You're excused.

21   The Government may call its next witness.

22              And the video, I think, is working now.

23              MR. MCNAIR:  I think we'll probably continue with

24   the DNA folks.

25              THE COURT:  That's fine.

1          MR. MCNAIR:  And can Ms. Smith be excused?

2          THE COURT:  She may.  Thank you.

3          THE WITNESS:  Thank you, Your Honor.

4          MR. MCNAIR:  And the Government calls Candi

5    Alvarado.

6          THE COURT:  All right.  Ms. Alvarado, come

7    forward to be sworn.

8                      **CANDI ALVARADO**,

9          After having been first duly sworn, did make the

10   following answers:

11                   **DIRECT EXAMINATION**

12   Q.  (BY MR. MCNAIR):  Good morning.

13   A.  Good morning.

14   Q.  So I know that you're a little soft-spoken kind of

15   like me, so just make sure you pull that microphone close to

16   you or speak into the microphone.

17   A.  Okay.

18   Q.  Could you please state your name?

19   A.  My name is Candi Alvarado.

20   Q.  And where do you work?

21   A.  I work at the FBI laboratory in Quantico, Virginia.

22   Q.  And were you working at the FBI lab in May of 2022?

23   A.  Yes, I was.

24   Q.  And what was your job at the lab at that time?

25   A.  I was a biologist in the DNA Casework Unit.

1    Q.    And did you receive specialized training to do that

2    job?

3    A.    Yes, I did.

4    Q.    And could you explain what some of that training was?

5    A.    My training period for collection lasted approximately

6    two months.  During that time, I was paired with a trainer.

7    I observed the trainer perform evidence collection

8    procedures on mock evidence, followed by a period where I

9    completed collection procedures on mock evidence.  After

10   that time, I was given a competency test where I performed

11   collection procedures on mock evidence independently.  And

12   then I was qualified after completing the competency test.

13   Q.    And what is your educational background?

14   A.    I have a bachelor of science in forensic science from

15   Virginia Commonwealth University.

16   Q.    And so in your time with the DNA Casework Unit, have

17   you swabbed firearms for DNA before?

18   A.    Yes, I have.

19   Q.    And briefly if you could just describe for the jury

20   what your typical process would be in swabbing a firearm.

21   A.    I would take a sterile swab.  I would add sterile

22   water to it and then swab the textured areas of the firearm,

23   which is the rough areas of the firearm.  I then cut the

24   swab with a sterile scalpel, and I place the swab into a

25   uniquely bar-coded tube.  I close the tube and then label

1    the tube with the lab number and the item number.

2    Q.   And, I guess, could you, while we're on the subject,

3    how -- you've processed buccal swabs before as well?

4    A.   Yes, I have.

5    Q.   What's the typical process for that?

6    A.   I would follow our SOPs to cut a portion of the buccal

7    swab and place that swab into a uniquely bar-coded tube,

8    close the tube, and then label it with the lab number and

9    the item number.

10   Q.   And so, in May of 2022, were you asked to process a

11   firearm seized from 1425 Durazno in Las Cruces, New Mexico?

12   A.   Yes.

13   Q.   And was the -- did you actually receive the firearm,

14   itself, at the laboratory?

15   A.   Yes, I had the firearm.

16   Q.   And do you recall what the make of the firearm was?

17   A.   It was a Ruger.

18   Q.   And did the firearm have any type of identifying or

19   serial number on it?

20   A.   Yes.  It did.

21   Q.   And do you recall what that was?

22           THE WITNESS:  May I refer to my notes?

23           THE COURT:  Yes, go ahead.

24   A.   The number was 371328743.

25   Q.   (BY MR. MCNAIR):  Okay.  I'm going to show you

1    Government's Exhibit 8.  And I see that you're

2    putting gloves on there.

3    A.   Yes.

4    Q.   Is that just out of an abundance of caution, out of

5    training?

6    A.   Yes.  I do not touch items of evidence without gloves

7    on.

8    Q.   And do you recognize that item?

9    A.   Yes.

10   Q.   And is that the gun that you received from 1425

11   Durazno?

12   A.   Yes, it is.

13   Q.   And is the serial number on that gun consistent with

14   the serial number you just read to us from your notes?

15   A.   Yes, it is.

16   Q.   And if I could have you just look on the front of the

17   box.  Do you see -- are your initials anywhere on the box?

18   A.   Yes, there are.

19   Q.   Could you point to where your initials are?

20   A.   Here by the lab number (indicating), "CLA."

21   Q.   So when would you have put your initials on that box?

22   A.   I'm sorry.  Could you repeat that?

23   Q.   At what point would you have put your initials on that

24   box?  Is that when you...

25   A.   Before I open the item.

44

1    Q.   Okay.  I'm going to show you Government's

2    Exhibit 7(d).

3              And so if you could -- if the screen is working,

4    could you just swab -- circle -- not the swab, but could you

5    circle on this gun where you would have swabbed for DNA.

6    A.   (Complying.)

7    Q.   And so you're circling the handle there?

8    A.   Yes.

9    Q.   Is that the textured areas that you were talking

10   about?

11   A.   Yes, that is the textured areas on this side of the

12   firearm (indicating).

13   Q.   Okay.  So you would have, I guess, swabbed all around

14   that textured area?

15   A.   Yes.

16             MR. MCNAIR:  Okay.  Could we look at Government's

17   Exhibit 7(e), please.  And could we remove the -- thank you.

18   Q.   (BY MR. MCNAIR):  And so I presume that you did

19   the same thing with the handle on this side?

20   A.   Yes, I did.

21   Q.   And is there any other thing that you see on this side

22   that you would have swabbed?

23   A.   Yes.

24   Q.   And could you circle that as well?

25   A.   (Complying.)

1    Q.    And so do you actually know what that part of the

2    firearm would be?

3    A.    No, I do not know the parts of the gun.

4    Q.    But you swabbed that one just because it has a

5    textured groove to it?

6    A.    Correct.

7              MR. MCNAIR:  And I guess, while we have this up,

8    could we delete that circle, please.

9              COURT CLERK:  I'm sorry, I didn't hear you.

10             MR. MCNAIR:  Could you delete that circle,

11   please?  Thank you.

12   Q.    (BY MR. MCNAIR):  And could you just put a line

13   under where the serial number was when you looked at

14   the one in the box.

15   A.    (Complying.)

16             MR. MCNAIR:  Thank you.  We can go ahead and take

17   down that exhibit.

18   Q.    (BY MR. MCNAIR):  And so we just kind of went

19   over it, but the process that you outlined for how

20   you go about swabbing a firearm, that's what you did

21   in this case?

22   A.    Yes, it is.

23   Q.    And what do you do with the swabs from the firearm

24   when you're done swabbing the gun?

25   A.    With the swab, as I said, I label the tube with the

1    lab number and the item number.  And after the collection is

2    completed, I'll put the item back into its packaging layers

3    and I will seal that with tape.  I'll seal each packaging

4    layer with tape and I'll put my initials on the tape.

5    Q.   And then you also said that you received a buccal

6    swab.  So did you process the buccal swab also for

7    collections?

8    A.   I did, yes.

9    Q.   And did you clean your work surface before you then

10   processed the buccal swab?

11   A.   Yes, I followed our SOPs to clean my workstation and

12   all of my tools with bleach prior to pulling out another

13   item.

14   Q.   And what were you wearing, I guess, through this whole

15   process?

16   A.   I was wearing my PPE, which stands for "personal

17   protective equipment."  So that consists of a lab coat,

18   gloves, facemask, and eye protection.

19   Q.   And so once you swab the buccal swab -- the swabs that

20   you took from the firearm that you processed, and the buccal

21   swab, those are all stored separately, correct?

22   A.   Yes, they're each in their own tube.

23   Q.   And then I guess, once you put them -- where do you

24   put them at that point?

25   A.   After the collections are complete, I transfer the

47

1    uniquely bar-coded tubes into a bar-coded refrigerator to

2    await further processing.

3     Q.   And once you've done that, does that conclude your

4    part of the testing process?

5     A.   Yes.

6              MR. MCNAIR:  I'll pass the witness, Your Honor.

7              THE COURT:  Cross-exam?

8                       **CROSS-EXAMINATION**

9     Q.   (BY THE DEFENDANT):  Good morning.

10    A.   Good morning.

11    Q.   So you're the biologist who did the initial testing of

12   the samples?

13    A.   Correct.

14    Q.   And so just to -- the fingerprinting, was that done by

15   you or was that done by another...

16    A.   I am just the DNA biologist.

17    Q.   And do you happen to know when the fingerprinting took

18   place?  Before or after?

19              MR. MCNAIR:  I would object on that, Your Honor.

20              THE COURT:  What was the objection?

21              MR. MCNAIR:  I'm objecting because that's outside

22   the scope of direct, and she lacks personal knowledge.

23              THE COURT:  Sustained.

24    Q.   (BY THE DEFENDANT):  So just the DNA samples is

25   all that you know about, as far as the testing?

1    A.    Correct.

2    Q.    But you don't happen to know if there was any

3    fingerprints found on that?

4              THE COURT:  That was --

5              MR. MCNAIR:  Objection.

6              THE COURT:  -- sustained.  That was sustained.

7    Don't ask about it.

8    Q.  (BY THE DEFENDANT):  During procedure, would

9    the DNA analysis take place first?

10   A.    I do not know the order that it would have gone

11   through the lab.  I only know my actions of how I completed

12   collections in this case.

13   Q.    And so as far as the procedures that you took, you

14   followed all the procedures that are necessary to the T?

15   A.    Yes.  I followed our SOPs.

16   Q.    Have you ever made mistakes working as a biologist?

17   A.    I have always followed our SOPs when completing

18   collections.

19   Q.    Just "yes" or "no," have you ever made mistakes?

20             MR. MCNAIR:  Objection, asked and answered.

21             THE COURT:  That was asked and answered.

22   Q.  (BY THE DEFENDANT):  Has your lab ever made

23   mistakes?

24             MR. MCNAIR:  Objection, lack of personal

25   knowledge.

1          THE COURT:  She's not the lab person.  She's the

2     swab person, so sustained.

3     Q.  (BY THE DEFENDANT):  As far as the well plate,

4     were you the one that put the samples into the well

5     plate?

6          MR. MCNAIR:  Objection, outside the scope and

7     lack of personal knowledge.

8          THE COURT:  Sustained.

9          THE DEFENDANT:  I thought she was the biologist

10    that did that?

11         THE COURT:  I mean, she -- you can ask questions

12    about what she testified to on direct, which is getting the

13    gun, swabbing it, and then turning the swabs over.  So

14    that's what she did.

15              (Discussion off the record.)

16    Q.  (BY THE DEFENDANT):  So when you took the swabs

17    on the firearm, who did you turn those over to?

18    A.   I transferred the swabs into a bar-coded refrigerator

19    to await further examination.

20    Q.   And how many people were in possession of those

21    samples?

22         MR. MCNAIR:  Objection, lack of personal

23    knowledge.

24         THE COURT:  Do you have personal knowledge of

25    that?

1              THE WITNESS:  I only know my part.

2              THE COURT:  Sustained.

3    Q.  (BY THE DEFENDANT):  So you can't say for sure

4    whether anybody else touched those samples?

5              THE COURT:  She just testified to that.  That's

6    asked and answered.

7    Q.  (BY THE DEFENDANT):  And you stated that you

8    wanted to put gloves on because you don't want to

9    touch any evidence.  Is that because the DNA is

10   easily transferred?

11   A.   I personally always wear gloves when I handle

12   evidence, even if it has already been processed.

13   Q.   And to your knowledge, the gloves that you're wearing

14   now, is there -- is your DNA going to be transferred into

15   those gloves?

16             MR. MCNAIR:  Objection, Your Honor.  Outside the

17   scope and lack of personal knowledge.

18             THE COURT:  I'll overrule that.

19             If you know the answer to that, you can answer.

20   A.   I do not know the answer.

21   Q.  (BY THE DEFENDANT):  And so you don't have no

22   personal knowledge as to any of the DNA that was

23   transferred onto that item until it reached the lab?

24   A.   I only know the actions I took with the evidence once

25   it was in my custody.

1    Q.   And if...

2              THE DEFENDANT:  Well, I guess that's all, Your

3    Honor.

4              THE COURT:  Redirect?

5                    **REDIRECT EXAMINATION**

6    Q.  (BY MR. MCNAIR):  Just one question:  So you

7    were kind of asked about some of processes and stuff

8    for the lab.  Would those have been more appropriate

9    questions for Ms. Smith?

10   A.   Yes.

11             MR. MCNAIR:  No further questions.

12             THE COURT:  Thank you for your testimony.  You're

13   excused.

14                  (End partial transcript.)

15                  * * * * * * * *

16

17

18

19

20

21

22

23

24

25

```
1                    UNITED STATES OF AMERICA

2                    DISTRICT OF NEW MEXICO

3

4               CERTIFICATE OF OFFICIAL REPORTER

5         I, Vanessa I. Alyce Chavez, CRR, RPR, NMCCR, and

6    Federal Official Court Reporter in and for the United States

7    District Court for the District of New Mexico, do hereby

8    certify that pursuant to Section 753, Title 28, United

9    States Code, that I did report in stenographic shorthand to

10   the best of my skill and ability the foregoing pages 1-51 of

11   the partial proceedings set forth herein, that the foregoing

12   is a true and correct partial transcript of Volume II of II

13   of the stenographically recorded proceedings held in the

14   above-entitled matter and that the transcript page format is

15   in conformance with the regulations of the Judicial

16   Conference of the United States.

17

18   Dated this 8$^{th}$ day of May 2024.

19

20   S/Electronically Filed
     _____
     Vanessa I. Alyce Chavez, CRR, RPR, NMCCR
21   Federal Official Court Reporter
     100 N. Church Street
22   Las Cruces, NM 88001
     Phone: (575) 528-1430
23   Email:  Vanessa_Alyce@nmd.uscourts.gov

24

25
```